

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

HEATHER PROTHRO, )
)
Plaintiff, )
) No. 04 C 7857
v. )
) Paul E. Plunkett, Senior Judge
NATIONAL BANKCARD )
CORPORATION, )
)
Defendant. )
)

## MEMORANDUM OPINION AND ORDER

Heather Prothro ("Plaintiff") has filed a lawsuit against National Bankcard Corporation ("Defendant"), alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, 28 U.S.C. § 1343, as well as the torts of assault and negligent retention and supervision of its employees. Plaintiff alleges she was sexually harassed and forced to work in a hostile work environment, she was retaliated against because of her harassment complaints, she was assaulted, and, finally, that Defendant negligently retained and supervised her manager, which allowed this conduct to occur. The case is now before us on Defendant's Federal Rule of Civil Procedure ("Rule") 56(b) motion for summary judgment. For the reasons stated below, Defendant's motion is granted in part and denied in part.

## Facts

Defendant is a company that sells credit card swipe machines to small business owners. (Def.'s Stmt. of Facts ¶¶ 1, 2.) Defendant maintains a staff of approximately thirty employees. (*Id.* ¶ 2.) There are ten salespeople, including the sales managers, fifteen telemarketers, and five other managers. (*Id.* ¶¶ 2, 3.) The sales staff is divided into three teams, with each team managed by one sales manager. (*Id.*) The human resources ("HR") and office manager, Sabiha Bari, hires, fires, disciplines, evaluates, trains, and pays all NBC employees at her location. (*Id.* ¶ 4.) She also assists in the sales process and tabulates commissions. (*Id.*) Defendant's employee handbook outlines NBC's policies, including the employee conduct and harassment policies. (*Id.* ¶¶ 5, 6, 11, 12, 15.) The handbook procedure encourages employees to raise any concerns with a supervisor or HR manager. (*Id.* ¶¶ 8, 9, 10, 15.) The handbook also outlines the progressive discipline procedure which warns that employees who violate NBC policy receive an oral warning, a written warning, probation, and finally termination. (*Id.* ¶ 9.) During the interview process, the terms of the manual are discussed with prospective employees and on the first day of employment, employees are provided with a copy and further discussion of the manual. (*Id.* ¶¶ 13, 14.) NBC does not conduct background checks for new employees. (Pl.'s Stmt. of Add'l Facts ¶ 66.)

William Bergman, Plaintiff's supervisor, was hired by NBC in June 2003 as a salesperson and one month later was promoted to sales manager. (Def.'s Stmt. ¶16.) In his management position, Bergman oversaw the salespeople who were selling credit card services and received a commission based upon the number of sales made by his team. (*Id.*) Bergman previously served a thirty-nine month prison sentence for bank robbery and has been arrested on several other occasions for shoplifting, drug possession, solicitation to buy drugs, disorderly conduct, and

2

solicitation of a sex act. (See Bergman Dep. at 12-28.) In addition, he has admitted to using at least seven different alias' and was involved in some physical altercations at work. (*Id.* At 39.) In 2004, he concedes he was on a doctor supervised methadone program for which NBC paid, but claims he was never convicted of any "violent" crimes. (Def.'s Stmt. ¶ 29); (Pl.'s Stmt. ¶ 65.) Bergman was the contact name printed on NBC's job advertisements; he was also involved in the interviewing, hiring, new hire paperwork and firing of employees. (*Id.* ¶¶ 60, 61, 63, 64.) Since September 2004, shortly after Plaintiff's departure, Bergman has not managed any employees. (Def.'s Stmt. at ¶ 29.)

On August 12, 2004, Heather Prothro was hired and on her first day of work she was presented with an NBC employee handbook which she was told to read. (*Id.* ¶ 18.) Plaintiff's immediate supervisor was Bergman and while either sitting at his desk, which was located in the middle of the large call center, or right beside a salesperson, he monitored phone calls and productivity of his staff. (*Id.* ¶ 19.) Plaintiff received positive feedback on her sales. (*Id.* ¶ 20,)

Plaintiff testified that during the employee training, Bergman's conduct was improper; she states that he talked about his involvement in a bar fight, his drug-use, and from August 16-24 Bergman made four to five statements to Plaintiff such as "hey beautiful," "hey babe," and "your husband must be a pretty lucky guy." (Pl.'s Add'l Stmt. ¶¶ 38, 39.) On August 25, 2004, Plaintiff was taking her lunch break when Bergman and coworker, Antoine Lee, walked through the cafeteria and had the following conversation:

| Bergman: | "When are you going to cook for everyone? |
| Prothro: | "When ya'all pay me." |
| Bergman: | "Well if you put it out there, I will pay you , then you'll be wanting to make breakfast for me every morning." |

Bergman says he only said he would buy the food and Plaintiff could cook. (Def.'s Stmt. ¶ 23.) Before she left work on August 25, 2004, Plaintiff claims that another coworker pointed out to Plaintiff that he noticed Bergman pulled his chair close to Plaintiff's and Bergman said that Plaintiff was "his number one girl." (Pl.'s Add'l. Stmt. ¶43.) Plaintiff did not report the incident, but took the next few days off because she felt humiliated, violated and degraded by the conversation. (Def.'s Stmt. ¶ 23; Pl.'s Stmt. ¶¶ 43, 44.) When Plaintiff next returned to work on approximately September 1, 2004, Bergman asked her if she had made complaints of sexual harassment against him. (Def.'s Stmt. ¶ 23.) After responding that she did not tell anyone, Bergman then said, "You know a threat like that could ruin my career and that could get someone killed or even hurt real bad." (*Id.* ¶¶ 23, 24.) Plaintiff missed the next two days of work and then came into NBC on September 3, 2004, to pick up her pay check and to speak to HR Manager Bari. (*Id.* ¶ 25.) In the meeting with Bari, Plaintiff reported the lunch room conversation with Bergman as well as his verbal threat, but Bari denies learning of these verbal threats during the conversation. (*Id.*) Bari explained to Plaintiff that she would speak with Bergman and asked Plaintiff to document the complaint in writing. (*Id.*) Plaintiff stated she could not work under Bergman because she felt threatened and claimed that she would have agreed to continue to work if Bergman was moved to another location. (*Id.* ¶¶ 47, 49.) Moreover, against Bari's requests, Plaintiff insisted on not being in the room when Bari spoke to Bergman. (Pl.'s Stmt. ¶ 46.) Plaintiff claims Bari told her that unless she was willing to sit in the room and face Bergman, her allegations would not be taken seriously. (*Id.*) Although Bari denies this assertion, Plaintiff also states that during the conversation, Bari told Plaintiff that Bergman had sexually harassed a woman at a previous job. (*Id.* ¶ 45.) After their conversation, Bari recommended that Plaintiff take a couple of days off of work. (*Id.*) Bari reported the incident to NBC's

4

owner, and he advised Bari to investigate the matter and ask all relevant parties what occurred. (Def.'s Stmt ¶ 25.) Plaintiff did not pursue medical attention as a result of the incidents and did not seek an order of protection against Bergman. (*Id.* ¶ 31.) Bari did not discipline Bergman or document his file and did not question any other employees about Bergman's threatening behavior. (*Id.* ¶¶ 50, 51, 56.) On September 8, 2004, Plaintiff faxed a letter to Bari in which Plaintiff demanded Bergman's termination by September 10, 2004, and if she was not informed of this, then she would consider herself terminated. (Def.'s Stmt. ¶ 28.) Bari claims that the letter was the first time she learned of Bergman's alleged verbal threats and upon receipt of the fax, immediately interviewed both Bergman and Lee. (*Id.* ¶ 27.) Bergman was not terminated and therefore, Plaintiff assumed her employment with NBC had ended. Plaintiff claims that since being employed with NBC, she has had difficulty resting and fears for the safety of her family and herself. (*Id.* ¶ 55.) Because of her anxiety, she was compelled to move in with her mother-in-law. (*Id.* 55.) On September 6, 2004, Plaintiff began a new job with a mortgage company. (Def.'s Stmt ¶ 30.) On September 14, 2004, Plaintiff filed a charge with the Equal Employment Opportunity Commission ("EEOC"). On December 6, 2004, Plaintiff filed the instant lawsuit. (*Id.* ¶ 33.)

## The Legal Standard

In order for a party to prevail on a motion for summary judgment, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, [must] show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). At this stage, we may not weigh the evidence or make any credibility determinations. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). We view

all evidence and draw all inferences in favor of the nonmoving party. *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). Summary judgment is appropriate only when the record as a whole establishes that no reasonable jury could find for the non-moving party. *Id.*

Additionally, where "undisputed facts give rise to disputed inferences," summary judgment is not appropriate. *Harley-Davidson Motor Co., Inc. v. Powersports, Inc.*, 319 F.3d 973, 989 (7th Cir. 2003) (ruling that "the choice between reasonable inferences from facts is a function of the fact-finder"); *see also Ramirez v. Nutrasweet Co.*, 1997 U.S. Dist. Lexis 17111, at *7 (N.D. Ill. Oct. 27, 1997) ("if the evidence presented by the parties is subject to conflicting interpretations, or if reasonable minds could differ as to its significance, summary judgment must not be granted") (citing *O'Connor v. Chicago Transit Auth.*, 985 F.2d 1366 (7th Cir. 1993)). Initially, the moving party must inform the court of the basis for the motion, but it is then the non-moving party's obligation to present specific facts showing there is a genuine issue for trial. FED. R. CIV. P. 56(e).

## Discussion

In Count I, Plaintiff claims that Defendant sexually harassed her, which created a hostile work environment. Pursuant to 42 U.S.C. § 2000e-2(a)(1), it is "an unlawful unemployment practice for an employer . . . to discriminate against any individual with respect to her compensation, terms, conditions, or privileges of employment because of an individual's race, color, religion, sex or national origin." *Moser v. Ind. Dept. of Corr.*, 406 F.3d 895, 902 (7th Cir. 2005). A plaintiff "may establish a violation of Title VII by proving that discrimination []created a hostile or abusive work environment." *Id.* In order to establish a *prima facie* case for hostile work environment based on sexual harassment, Plaintiff must show: (1) she was subjected to unwelcome sexual advances; (2)

6

the harassment was based on her gender; (3) the harassment had the effect of unreasonably interfering with her work and created an intimidating, hostile, or offensive working environment; and (4) a basis for employer liability exists. *Whittaker v. N. Ill. Univ.*, 424 F.3d 640, 645 (7th Cir. 2005). The harassment must be both objectively and subjectively severe or pervasive that it alters the employee's working environment. *Faragher v. City of Boca Raton*, 524 U.S. 775, 786 (1998); *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 975 (7th Cir. 2004).

Defendant argues that Plaintiff has failed to satisfy the third and fourth prongs of this test. First, as to the third prong, in determining the severity of the conduct, a court must consider the totality of the circumstances, "including the frequency and severity of conduct, whether it is threatening and/or humiliating or merely offensive, and whether the harassment unreasonably interferes with an employee's work." *Whittaker*, 424 F. 3d at 645 (stating the threshold to prove hostile environment is high and "the workplace that is actionable is one that is 'hellish.'" *Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1013 (7th Cir. 1997)). Plaintiff must present evidence that the offending party showed "direct, unambiguous hostility to [Plaintiff] because of her gender." *Shanoff v. Ill. Dep't of Human Servs.*, 258 F.3d 696, 705–706 (7th Cir. 2002) (quoting "there is no 'magic number' of slurs that indicate a hostile work environment.").

Here, Bergman's comments such as "hey babe," "hey beautiful" and "your husband must be a pretty lucky guy" were relatively isolated. *Saxton v. American Tel. & Tel. Co.*, 10 F.3d 526, 533 (7th Cir. 1993) (stating that "relatively isolated instances of non-severe misconduct will not support a claim of a hostile environment.") Although these comments could be construed as having some questionable undertones, we believe they do not rise to the severe level needed to be a sufficient basis for a hostile work claim. Courts that have found much more "vulgar," "coarse," and "boorish"

7

behavior as inactionable. *Whittaker*, 424 F. 3d at 645 (stating that in a hostile work environment claim the Seventh Circuit has found calling plaintiff "pretty girl," grunting after her, telling her that she should run around naked and making lewd gestures as inactionable.). However, these comments, combined with the lunch-room conversation in which Bergman essentially propositions Plaintiff, the coworker who witnesses Bergman sit unusually close to Plaintiff, Bergman saying that Plaintiff was his "number one girl," and the verbal threat, do rise to the level of actionable behavior. These incidents, assuming they are true, would permit a reasonable jury to conclude that Plaintiff has satisfied the third prong of her prima facie case.

As to the fourth prong, Defendant invokes an affirmative defense, claiming there is no employer liability. "An employer is vicariously liable for actionable discrimination caused by a supervisor, but subject to an affirmative defense looking to the reasonableness of the employer's conduct as well as that of a plaintiff victim." *Faragher*, 524 U.S. at 780; *Burlington Indus., Inc., v. Ellerth*, 542 U.S. 742 (1998). The employer may only invoke the defense if a tangible employment action was not taken. *Id.* at 807 (stating that a tangible employment action, for example, is discharge, demotion, or undesirable reassignment.). Once it has been established that there was no employment action, to succeed in the affirmative defense it must be shown that "(a) the employer exercised reasonable care to prevent and correct promptly any []harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Id.* (stating where an employee does not use a company's complaint procedure, the second prong of the test is usually satisfied.)

Defendants believe they have satisfied the *Ellerth/Faragher* tests because they claim no tangible employment action resulted from the harassment[1] and also they have established: (1) they had a program to regularly train employees which shows their effort to prevent or correct harassing behavior; and (2) Plaintiff failed to take advantage of NBC's complaint procedures in order to mitigate her injury.

Plaintiff argues that her resignation was actually a constructive discharge, which qualifies as a tangible employment action that resulted from the harassment. To establish constructive discharge, a Plaintiff must show she was forced to resign because her working conditions were so intolerable that a reasonable person would have been compelled to resign. *E.E.O.C. v. Univ. of Chicago Hosps.*, 276 F.3d 326, 331-32 (7th Cir. 2002). To demonstrate that the environment was unbearable, Plaintiff must prove there was more severe conduct than one would normally present in a hostile work environment claims. *Id.* (stating that where employee alleges he was forced to resign because of discriminatory harassment, employee must demonstrate an environment that is more egregious than the atmosphere that must be present to prove hostile work environment); *Tutman v. WBBM-TV, Inc.*, 209 F.3d 1044, 1050 (7th Cir. 2000).

Given the events that Plaintiff was forced to endure at the hands of Bergman, Plaintiff has alleged conduct that could be considered as constructive discharge. Although the events occurred in a relatively short time period, we must assume that Plaintiff who, as far as the record shows, heard nothing from NBC after she demanded Bergman's transfer or termination and felt that working at NBC was so traumatic that it was not an option. There was no action, not even a phone call to

---

[1] Defendants assert that because Plaintiff resigned, there was no tangible employment action.

Plaintiff, to let her know that the investigation was under way or that NBC was taking corrective action against Bergman. Although Bergman was demoted, Plaintiff was not notified. This lack of communication is adequate for Plaintiff to conclude that NBC did not address her concerns and is enough for a reasonable jury to determine that she had a right to feel her resignation was a constructive discharge. Thus, because Plaintiff has established that a tangible employment action occurred, Defendant's affirmative defense fails. Bergman was clearly Prothro's manager, creating employer liability, and therefore Plaintiff has made her prima facie case. Thus, Defendant's motion for summary judgment on the hostile work environment/sexual harassment claim is denied.[2]

In Count II of her Complaint, Plaintiff claims retaliation. Pursuant to Title VII, an employer may not retaliate against an employee who has "opposed any practice made an unlawful employment practice . . . or has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing." 42 U.S.C. § 2000e-3(a).

Plaintiff fails to make her case. Prothro points to no evidence that connects her resignation, with the fact that she had brought Bergman's sexually harassing remarks to Bari's attention. The only implication of retaliation is that there was a short period of time between her complaints and resignation. However, as the Seventh Circuit has repeatedly told us, suspicious timing, alone, rarely is sufficient to support a prima facie case for retaliation or to create a triable issue of fact. *Bilow v. Much Shelist Freed Denenberg Ament & Rubenstein*, P.C., 277 F.3d 882 (7th Cir. 2001) (stating that there needs to be more than "a coincidence of timing to create a reasonable inference of retaliation . . . [r]ather, other circumstances must also be present which reasonably suggest that the two events

---

[2]Because Plaintiff's failure to establish the third prong of the hostile work environment claim disposes of the Count, we need not address Defendant's arguments regarding the fourth prong of the test.

are somehow related to one another.") (quoting *Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 918 (7th Cir. 2000).) There are simply no other circumstances to suggest Bari was punishing Plaintiff for her complaints. Nor is there evidence from which a reasonable jury could conclude that there was a connection between Plaintiff's complaints and resignation. In fact, in the very same month that Plaintiff made her complaint, Bari took corrective action and demoted Bergman. We believe a reasonable jury could not conclude that Plaintiff was retaliated against, and therefore Defendant's motion for summary judgement on Count II is granted.

In Count III, Plaintiff claims that Bergman assaulted her and in Count V, Plaintiff states that, under the doctrine of *respondeat superior*, NBC is vicariously liable for Bergman's tortious actions. NBC contends that when committing the tort, Bergman strayed from his employment duties and therefore pursuant to the doctrine of *respondeat superior*, NBC is not vicariously liable for the intentional torts of its employees. Under *respondeat superior*, for an employer to be liable for the torts of its employees, a plaintiff must show that a principal/agent relationship exists and that the agent committed a tort while acting in the scope of his employment. Restatement (Second) of Agency § 219(1); *See Alms v. Baum*, 796 N.E.2d 1123, 1127 (Ill. App. Ct. 2003) (under *respondeat superior* doctrine, an employer can be liable for acts of employees, even if acts are wilful, malicious or criminal). The tort may be either negligent or intentional to impute liability to the employer. *Burlington Indus. v. Ellerth*, 524 U.S. 742, 755-56 (1998). The employer will be liable when the employee's 'purpose, however misguided, is wholly or in part to further the master's business.' *Id.* (citing W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts § 70, p. 505 (5th ed. 1984)). Furthermore, the Restatement deems an intentional tort to be within the scope of employment when it is committed, at least in part, to serve or further the employer's business,

despite its illegality or violation of employer policy. *Restatement (Second) of Agency* § 219(1). The factors considered in determining whether an employee's acts fall within the scope of her employment, so that the employer may be held liable for acts under this doctrine are: (1) if the acts are of a type the employee is employed to perform; (2) if the acts at issue occur substantially within the authorized time and space limits; and (3) if the acts are done, at least in part, by an intent to serve the employer. *Hargan v. Sw. Elec. Coop.*, 311 Ill. App. 3d 1029, 1031 (5th Dist. 2000).

Here, Defendant does not dispute that Bergman assaulted Plaintiff, it only contends that Bergman was not acting in the scope of his employment, and NBC is therefore not liable for the assault. We disagree. Bergman allegedly told Plaintiff that claiming he sexually harassed her "could get someone killed or even hurt real bad." The words were uttered in a discussion between manager and employee, the threat of violence happened in the work place, and in part it was to protect his reputation at work. In light of the factors outlined in *Hargan*, a jury could reasonably conclude that Bergman was acting within the scope of his employment when he committed the intentional tort. Thus, NBC may be liable Bergman's assault and summary judgement as to Count III and Count V is denied.

Finally, in Count IV, Plaintiff asserts that Defendant negligently supervised and retained Bergman. These intentional torts, Defendant says, are not viable because they are precluded by the Illinois Human Rights Act ("IHRA"), which vests the Illinois Human Rights Commission with exclusive jurisdiction over "alleged civil rights violation[s]." 775 ILL. COMP. STAT. 5/8-111(C) ("No court of this state shall have jurisdiction over the subject of an alleged civil rights violation other than as set forth in this Act."). An employer commits a civil rights violation when, among other things, it acts against an employee "on the basis of unlawful discrimination." 775 ILL. COMP. STAT.

5/2-102(A). "Unlawful discrimination" includes "discrimination against a person because of his . . . gender." 775 ILL. COMP. STAT. 5/1-103(Q).

According to the Illinois Supreme Court, the IHRA deprives courts of jurisdiction not only over claims that constitute civil rights violations, but also over any other claim that is "inextricably linked to a civil rights violation such that there is no independent basis for the action apart from the Act itself." *Maksimovic v. Tsogalis*, 687 N.E.2d 21, 23 (Ill. 1997). Facts are "inextricably linked" if there is no foundation for the tort without reference to the civil rights violation. *Westphal v. City of Chicago*, 8 F. Supp. 2d 809, 812 (N.D. Ill.1998). A common law tort is not preempted where plaintiff raises an independent cause of action that does not depend solely on allegations of sexual harassment. *See, e.g., Jaslowski v. Cello P'ship*, No. 02-3601, 2002 WL 31085092, at *3–*4 (N.D. Ill. Sept. 17, 2002).

Plaintiff contends that her claims are not preempted because they are not inextricably linked with her sexual harassment claims. She asserts that the statement that gave rise to the assault claim is separate from her sexual harassment complaints. If the assault is based upon the gender discrimination and retaliation we will have no jurisdiction; but if the claims are based solely on Bergman's physical threats and are not inextricably linked to her gender discrimination claim, then they escape preemption. These threats were made at an entirely different time and location from the incidents that gave rise to Plaintiff's sexual harassment claim. When Bergman allegedly assaulted Plaintiff, Bergman told Plaintiff that claiming someone was a harasser could get that person in a lot of trouble or hurt. Plaintiff's negligent supervision/retention claim does not depend solely on the allegations surrounding her sexual harassment claims. We believe that Plaintiff's negligent

13

supervision/retention claim could exist even in the absence of the gender discrimination/harassment claim, and they are therefore not preempted by the IHRA.

The fact that the claim is not preempted does not, however, ensure its success. To state a claim for negligent supervision Plaintiff must allege: (1) the employer had a duty to supervise its employees; (2) the employer negligently supervised an employee; and (3) such negligence proximately caused Plaintiff's injuries. *Van Horne v. Muller*, 294 Ill. App. 3d 649, 657 (1998), modified on other grounds,185 Ill. 2d 299 (1999).

Here, Defendant does not dispute that an employer has a duty to supervise. But, NBC contends that it did not breach any duty and that Plaintiff's injuries were not caused by NBC's alleged inaction. Bergman is a convicted bank robber, shoplifter, sexual solicitor and drug user. With such a questionable past, Bergman should have been more scrutinized during the hiring process and certainly in his role as a manager to other employees. If NBC allowed someone with such criminal convictions the authority to supervise other individuals, it should have closely monitored him to ensure that he committed no missteps against other employees. Although he was performing well when he was a sales person, once he assumed a position of authority, he should have been warned that one failure to abide by all rules would result in his termination. Plaintiff complains that because of Bergman's threats, she feared for her and her family's life, and she was forced to move and change jobs. Taking Plaintiff's allegations as true, these injuries could be attributed to the breach of not properly supervising an employee. Moreover, whether a party breached their duty is a question of fact, normally reserved for a jury's determination. *Thompson v. County of Cook*, 154 Ill. 2d 374, 382 (1993). Thus, as to the negligent supervision claim summary judgment is not appropriate and Defendant's motion is denied.

Similarly, to prevail on the negligent retention theory, Plaintiff must offer some evidence that "the employer knew or should have known that its employee had a particular unfitness for his position so as to create a danger of harm to third persons and that the employer's failure to safeguard the plaintiff against this particular unfitness proximately caused the plaintiff's injury." *Platson v. NSM, America, Inc.*, 748 N.E. 2d 1278, 1284 (Ill. App. Ct. 2001); *Van Horne*, 185 Ill. 2d at 310. To successfully plead negligent retention, it is not enough for Plaintiff to simply allege that the employee was generally unfit for employment; rather, liability arises in this context when the particular unfitness of the employee gives rise to a particular danger or harm to third parties, and that unfitness rendered the plaintiff's injury foreseeable to a person of ordinary prudence in the employer's position. *Van Horne*, 185 Ill. 2d at 313.

NBC had a duty to protect its employees from other employees who may create a danger or harm. Bari and the other managers at NBC were well aware of Bergman's criminal record; in fact, Bergman was wearing an electronic monitor for part of his employment, and his parole officer regularly visited his place of employment. Furthermore, Bergman missed several weeks of work for court and legal appointments, as well as to receive treatment for his drug problem. A person with such a criminal record and ongoing offenses should not have been in a position of authority, and we believe the facts, if proven, establish that he was unfit and could have presented a risk of injury or harm to a third party. Plaintiff sufficiently presents to us that, based on Bergman's "checkered past," it is foreseeable that he may have a propensity to commit violent crimes. Plaintiff's claim for negligent retention survives and thus, Defendant's motion for summary judgement on Claim IV is also denied.

## Conclusion

For the reasons stated above, NBC's motion for summary judgment is granted in part and denied in part. Defendant's motion for Count II is granted and for Counts I, III, IV, and V are denied.

**ENTER:**

_____
UNITED STATES DISTRICT JUDGE

DATED: **AUG 3 2006**